1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RICHARD COLLINS,

Petitioner,

v.

JIM ROBERTSON, Warden,

Respondent.

Case No. 5:22-cv-00755-SB-KES

ORDER TO SHOW CAUSE WHY
PETITION SHOULD NOT BE
DISMISSED AS UNTIMELY

On January 6, 2022, Richard Collins ("Petitioner") constructively filed a Petition for Writ of Habeas Corpus by a Person in State Custody under 28 U.S.C. § 2254. ("Petition" at Dkt. 1.)[1] As discussed more fully below, the Court orders Petitioner to show cause why the Petition should not be dismissed as untimely.

---

[1] January 6, 2022 is the date when Petitioner signed the Petition. (Dkt. 1 at 11.) The Court assumes, for purposes of this order, that Petitioner is entitled to the benefit of the prison mailbox rule, under which "a prisoner's pro se habeas petition is deemed filed when he hands it over to prison authorities for mailing to the relevant court." Campbell v. Henry, 614 F.3d 1056, 1058-59 (9th Cir. 2010) (citation omitted); see also Butler v. Long, 752 F.3d 1177, 1178 n.1 (9th Cir. 2014) (noting that, in the absence of other evidence, courts generally deem a habeas petition filed on the day it was signed).

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## BACKGROUND

The following facts are taken from the Petition, from the Court's own records, or from public records.[2]  Where necessary, the Court takes judicial notice of the latter.  See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.")

In June 2007 a jury in San Bernardino County Superior Court case no. F-VI-020182 convicted Plaintiff of two counts of attempted, premeditated murder and other crimes.  (Dkt. 1 at 1-2); People v. Collins, No. G041022, 2009 Cal. App. Unpub. LEXIS 7903 (Sep. 30, 2009).  The evidence presented at trial, as summarized by the California Court of Appeal, is set forth in italics below:

*Blokzyl pulled into the parking lot of a mini-mart in Lucerne Valley.  As he approached the propane dispenser to refill his barbeque tank, he noticed [Petitioner] drive into the parking lot in a white sedan.  [Petitioner] exited his vehicle and accosted Blokzyl, demanding whether he "always drove this way."  Becoming increasingly agitated, [Petitioner] accused Blokzyl, "Well, you cut me off.  You almost hit my vehicle."  Blokzyl tried to explain he had to stop for another vehicle so he could safely turn into the parking lot.  Although Blokzly believed he had the right of way, he nevertheless apologized to [Petitioner] to defuse the confrontation.  [Petitioner], however, with a rising tone in his voice, became angrier and was soon yelling at Blokzyl.  Blokzyl backed away in a further effort to*

---

[2] The public records of the California appellate courts are available at: https://appellatecases.court info.ca.gov.

place [Petitioner].  But [Petitioner] lunged at him, reaching for his throat and grabbing Blokzyl's necklace.  Pulling Blokzyl towards him with enough force to break the necklace, [Petitioner] struck Blokzyl on the left side of his chest.  Blokzyl had not seen [Petitioner] wielding any weapon, but he immediately felt a sharp pain where [Petitioner] struck him, and blood began to run freely from a two-inch gash there. The blood poured to Blokzyl's knees.

Blokzyl clutched his chest, and called for help from an attendant.  Before [Petitioner] entered his nearby car, he bent his rear license plate upwards to make it less visible.  Blokzyl bent the plate down and the attendant recorded the number as [Petitioner] sped off.  The attendant had witnessed the confrontation, heard [Petitioner] complaining about being cut off, and saw [Petitioner] push Blokzyl, but did not see him use a weapon.

Paramedics responding to the scene bandaged Blokzyl's wound.  When the paramedics were summoned to another emergency call, Blokzyl's wife drove him to the emergency room.  There, a doctor determined the stabbing thrust did not penetrate Blokzyl's heart or lungs.  The wound, however, was deep: the doctor's probe penetrated to a depth of two and one-half inches into Blokzyl's chest.  After receiving stitches to close the wound, Blokzyl underwent a series of CAT scans and X-rays to ensure he had suffered no internal bleeding.

Back at the mini-mart, a witness had stepped forward to inform Deputy Sheriff Greg Winegar that he knew where to locate Blokzyl's assailant.  The witness directed the officer to a trailer on Blake Road two or three minutes away.  There, Winegar found a white Ford matching the suspect vehicle's description.  The rear license plate had been bent up and the car was blanketed with a tarp covered by a piece of plywood.  The door handle of the car had fresh blood on it and, though it was a cool evening, the hood of the car was warm to the touch.  A license check revealed the vehicle was registered to [Petitioner].  A man and a woman answered Winegar's knock at the trailer door, but neither knew or disclosed [Petitioner]'s

1    *whereabouts.*

2         *The next day, another deputy returned to the Blake Road area, where he*

3    *received a tip [Petitioner] was staying at a residence on Squaw Bush Road in*

4    *Lucerne Valley.  The deputy, Michael Gilley, proceeded to the residence with*

5    *Sergeant Errol Bechtel, Detective Dale Jensen, and two other deputies.*

6    *Approaching the residence, the deputies noticed the front door was open.  Because*

7    *one of the vehicles in which they arrived was a marked unit, and based on the open*

8    *front door, the deputies feared [Petitioner] might have detected their approach.*

9    *Based on his violent assault the day before and information they had received that*

10   *[Petitioner] was armed, the posse determined the circumstances called for a "rapid*

11   *approach" and entry of the home.  A law enforcement helicopter circled overhead.*

12        *Bechtel and Gilley entered the front door, with Bechtel calling out,*

13   *"Richard."  Bechtel knew [Petitioner] from previous encounters.  Bechtel heard*

14   *footsteps approaching.  When [Petitioner] entered the living room and spotted*

15   *Bechtel, who was wearing his uniform, [Petitioner] uttered, "Uh-oh," and*

16   *retreated down a hallway.  Bechtel followed him.  He spied [Petitioner] in a well-lit*

17   *bedroom grasping an assault rifle with a raised sight, pointed towards the ground.*

18   *Yelling, "Gun," Bechtel reached for his service weapon and when he drew it out,*

19   *[Petitioner] stated, "Look," as he pulled his weapon up to waist height and pointed*

20   *it directly at Bechtel, just eight feet away.  Bechtel reacted immediately by*

21   *sidestepping to his left and firing a round before [Petitioner] could discharge his*

22   *weapon.  Bechtel and Gilley were able to retreat out of the house.  [Petitioner] had*

23   *not fired a shot.*

24        *Bechtel positioned himself under a window, fired two more rounds into the*

25   *house when he saw movement in the bottom portions of curtains in the window, and*

26   *then ran and dove over a rock wall.  From the rear of the house, Gilley could hear*

27   *[Petitioner] declaring, "I'm going to kill a cop today.  I'm not going to jail.  Shoot*

28   *me."  Detective Jensen also heard [Petitioner] stating he would not come out and*

1  *that he "would kill a cop today."  Throughout the standoff, which lasted nearly an*

2  *hour, the deputies observed [Petitioner] appearing in the doorway and in front of a*

3  *window, sometimes with the rifle in his hands and sometimes without it.  Later, the*

4  *deputies heard a hammering noise and loud banging from the house.  Eventually,*

5  *[Petitioner] exited the house without his gun and surrendered.*

6      *Law enforcement swept the house, finding no one else present.  The deputies*

7  *noticed a portion of drywall had been hammered to the wall with roofing nails.*

8  *Obtaining a search warrant, Jensen found [Petitioner] had secreted his assault*

9  *rifle behind the drywall barrier he had constructed.  Loaded with nine bullets in a*

10  *magazine, plus one round chambered and ready to fire, the rifle's safety was in the*

11  *"fire[] position."  Investigators also found a Samurai sword, a battle axe, a*

12  *machete, a dagger, shears, a multi-bladed knife tool, nunchackus, and 12-gauge*

13  *shotgun shells in the bedroom of the house.*

14      *The defense rested without presenting any evidence.*

15  People v. Collins, 2009 Cal. App. Unpub. LEXIS 7903, at *3-8.

16      The California Court of Appeal affirmed the judgment of conviction in an

17  opinion dated September 30, 3009.  Id.  The California Supreme Court denied a

18  Petition for Review.  People v. Collins, No. S177786, 2010 Cal. LEXIS 249 (Jan.

19  13, 2010).

20      Plaintiff does not allege that he filed any state habeas petitions.  (Dkt. 1 at 3-

21  4.)  Per the Central District's electronic case records, the instant Petition is the first

22  federal § 2254 petition filed by Petitioner.

23                          **II.**

24                    **CLAIMS**

25      Claim One: Petitioner was convicted of multiple offenses arising out of the

26  same facts in violation of the Double Jeopardy Clause.  (Dkt. 1 at 6.)

27      Claim Two: Petitioner's sentence must be modified to prevent a continuing

28  miscarriage of justice, per the Eighth Amendment and People v. Fanelli, No.

1   D076646, 2020 Cal. App. Unpub. LEXIS 1991 (Mar. 27, 2020).  (Dkt. 1 at 7.)

2          <u>Claim Three</u>: Plaintiff's sentence is disproportionate to his crime in violation

3   of the Eighth Amendment.  (Dkt. 1 at 8.)

4                                                 **III.**

5                                           **DISCUSSION**

6          Rule 4 of the Rules Governing Section 2254 Cases in the United States

7   District Courts requires the district court to dismiss a habeas petition "[i]f it plainly

8   appears from the petition and any attached exhibits that the petitioner is not entitled

9   to relief in the district court...."  Under this rule, district courts are "permitted, but

10  not obliged, to consider, <u>sua</u> <u>sponte</u>, the timeliness of a state prisoner's habeas

11  petition."  <u>Day v. McDonough</u>, 547 U.S. 198, 202 (2006).  "[B]efore acting on its

12  own initiative, a court must accord the parties fair notice and an opportunity to

13  present their positions."  <u>Id.</u>

14  **A.    <u>Federal One-Year Statute of Limitations</u>**

15         **1.    Legal Standard**

16         This action is subject to the Antiterrorism and Effective Death Penalty Act of

17  1996 ("AEDPA"), which provides as follows:

18         **(d)  (1)** A 1-year period of limitation shall apply to an application for

19         a writ of habeas corpus by a person in custody pursuant to the

20         judgment of a State court. The limitation period shall run from the

21         latest of--

22         **(A)** the date on which the judgment became final by the conclusion of

23         direct review or the expiration of the time for seeking such review;

24         **(B)** the date on which the impediment to filing an application created

25         by State action in violation of the Constitution or laws of the United

26         States is removed, if the applicant was prevented from filing by such

27         State action;

28         **(C)** the date on which the constitutional right asserted was initially

                                                        6

1    recognized by the Supreme Court, if the right has been newly

2    recognized by the Supreme Court and made retroactively applicable to

3    cases on collateral review; or

4    **(D)** the date on which the factual predicate of the claim or claims

5    presented could have been discovered through the exercise of due

6    diligence.

7  28 U.S.C. § 2244(d).

8        Thus, AEDPA "establishes a 1-year time limitation for a state prisoner to file

9  a federal habeas corpus petition." Jimenez v. Quarterman, 555 U.S. 113, 114

10 (2009).   The statute of limitations period generally runs from "the date on which

11 the judgment became final by the conclusion of direct review or the expiration of

12 the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).   Where a state

13 defendant seeks direct review in a state's highest court, the judgment becomes final

14 when time for seeking certiorari review in the U.S. Supreme Court expires.  See

15 Jimenez, 555 U.S. at 120.  This is because the U.S. Supreme Court has jurisdiction

16 over final decisions of the highest state court "in which a decision could be had"

17 respecting a constitutional right or other federal law.  28 U.S.C. § 1257(a).  To

18 appeal to the U.S. Supreme Court, a petition for writ of certiorari must be filed

19 within 90 days after entry of the state court judgment.  U.S. Sup. Ct. R. 13.

20        **2.    Analysis**

21        The California Supreme Court denied the Petition for Review on January 13,

22 2010.  Plaintiff's criminal judgment became final 90 days later on April 13, 2010.

23 Under AEDPA, Plaintiff had until April 13, 2011 to file his § 2254 petition, absent

24 the application of tolling or some other doctrine discussed below.  He did not file

25 the instant petition until January 2022, more than ten years too late.

26 **B.    Statutory Tolling**

27        AEDPA provides for statutory tolling for the "time during which a properly

28 filed application for State post-conviction or other collateral review with respect to

the pertinent judgment … is pending." 28 U.S.C. § 2244(d)(2).  Statutory tolling "does not permit the reinitiation of a limitations period that has ended before the state petition was filed," even if the state petition was timely filed.  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir.), cert. denied, 540 U.S. 924 (2003).  The burden of demonstrating that AEDPA's one-year limitation period was sufficiently tolled, whether statutorily or equitably, rests with the petitioner.  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

Plaintiff has not filed any state habeas petition(s), so he cannot obtain statutory tolling.  (Dkt. 1 at 3-4.)

**C.    Equitable Tolling**

AEDPA's one-year limitation period is subject to equitable tolling if the petitioner shows: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  The petitioner "must show that he has been reasonably diligent in pursuing his rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in federal court."  Smith v. Davis, 953 F.3d 582, 598-99 (9th Cir. 2020) (en banc) (rejecting a "stop-clock approach" to equitable tolling).  In other words, "it is not enough for a petitioner seeking an exercise of equitable tolling to attempt diligently to remedy his extraordinary circumstances; when free from the extraordinary circumstance, he must also be diligent in actively pursuing his rights."  Id. at 599.

"The diligence required for equitable tolling purposes is reasonable diligence … not maximum feasible diligence," Holland, 560 U.S. at 653 (citations and quotation marks omitted), and courts consider "the petitioner's overall level of care and caution in light of his or her particular circumstances."  Doe v. Busby, 661 F.3d 1001, 1013 (9th Cir. 2011); see also Smith, 953 F.3d at 600-01 (emphasizing that

1  the doctrine "does not impose a rigid 'impossibility' standard on litigants,

2  especially not on 'pro se prisoner litigants—who have already faced an unusual

3  obstacle beyond their control during the AEDPA limitation period,'" but noting that

4  it usually "requires the petitioner to work on his petition with some regularity—as

5  permitted by his circumstances—until he files it in the district court") (citation

6  omitted).

7       "[T]he threshold necessary to trigger equitable tolling [under AEDPA] is

8  very high, lest the exceptions swallow the rule." Miranda v. Castro, 292 F.3d 1063,

9  1066 (9th Cir.), cert. denied, 537 U.S. 1003 (2002).  Consequently, equitable tolling

10  will be justified in few cases.  Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003).

11  The Petition does not allege the existence of any circumstances that might justify

12  equitable tolling over ten years.

13  **D.  Actual Innocence**

14       Under Schlup v. Delo, 513 U.S. 298 (1995), "a credible claim of actual

15  innocence constitutes an equitable exception to AEDPA's limitations period, and a

16  petitioner who makes such a showing may pass through the Schlup gateway and

17  have his otherwise time-barred claims heard on the merits." Lee v. Lampert, 653

18  F.3d 929, 932 (9th Cir. 2011).  "In order to present otherwise time-barred claims to

19  a federal habeas court under Schlup, a petitioner must produce sufficient proof of

20  his actual innocence to bring him within the narrow class of cases … implicating a

21  fundamental miscarriage of justice." Id. at 937 (internal quotation marks and

22  citations omitted).  While a petitioner is not required to proffer evidence creating an

23  "absolute certainty" about his innocence, the Schlup gateway is an "exacting

24  standard" that permits review only in the "extraordinary case." Id. at 938.

25  Specifically, a petitioner must show "that it is more likely than not that no

26  reasonable juror would have convicted him in light of the new evidence." Lee, 653

27  F.3d at 938 (quoting Schlup, 513 U.S. at 327).  The petitioner must support his

28  allegations "with new reliable evidence—whether it be exculpatory scientific

1  evidence, trustworthy eyewitness accounts, or critical physical evidence—that was

2  not presented at trial."  Lee, 653 F.3d at 938 (quoting Schlup, 513 U.S. at 324;

3  emphasis added).

4       Petitioner does not make a claim of actual innocence.

5  **E.**    **People v. Fanelli, 2020 Cal. App. Unpub. LEXIS 1991 (Mar. 27, 2020).**

6       Plaintiff may be attempting to rely on Fanelli to argue that he can challenge

7  the constitutionally of his state sentence at any time.  Fanelli cites California

8  procedural law holding that "an unauthorized sentenced may be corrected at any

9  time."  Id. at *4.  That state law does not help Plaintiff.  AEDPA governs the filing

10 deadline for all federal § 2254 habeas petitions, even those challenging a sentence

11 under the Eighth Amendment.  28 U.S.C. § 2244(d).

12 **IV.**

13 **CONCLUSION**

14      IT IS THEREFORE ORDERED that, **on or before July 15, 2022**, Petitioner

15 must show cause in writing, if any he has, why the Court should not recommend

16 that this action be dismissed with prejudice on the ground of untimeliness.

17

18

19 DATED: June 16, 2022          _Karen E. Scott_____

20                       KAREN E. SCOTT

21                       UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28